## Case No. 11,619.

### The REBECCA.

[1 Ware (188), 187; [1] 6 Am. Jur. 5.]

District Court, D. Maine. 1831.

SHIPPING—MARITIME TORT—PRIORITY—LACHES—MASTER'S DUTIES.

1. A merchant who ships merchandise in a vessel, on freight, has a lien on the vessel for the loss of his goods, or any damage they may sustain from the fault or neglect of the master, or the insufficiency of the vessel.

[Cited in Cole v. Atlantic, Case No. 2,976; Howe v. The Lexington, Id. 6.967a; McGuire v. The Golden Gate. Id. 8.815; Perkins v. Hill, Id. 10,986; Hale v. Washington Ins. Co., Id. 5,916; Stone v. The Relampago, Id. 13,486; The Hendrik Hudson. Id. 6,358; The Avon, Id. 680; Dupont de Nemours v. Vance, 19 How. (60 U. S.) 169.]

2. He may enforce his lien by process in rem against the vessel, in the admiralty.

[Cited in Hale v. Washington Ins. Co., Case No. 5,916; Cole v. The Atlantic, Id. 2,976; Howe v. The Lexington, Id. 6,767a; The Gold Hunter, Id. 5,513; Knox v. Ninetta, Id. 7,912; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 420; The Champion, Id. 2,583; Jones v. The Floating Zephyr, Id. 7,462; The Maggie Hammond, 9 Wall. (76 U. S.) 451; The T. A. Goddard, 12 Fed. 178.]

3. In such a case the vessel is, by the marine law, hypothecated to the merchant for his damages, from the time that the misfortune happens, and his claim against it is preferred to the right of the general creditors of the owners.

[Cited in Cole v. The Atlantic, Case No. 2,976; Lowry v. The E. Benjamin, Id. 8,582; The Planter, Id. 11.207a; The Illinois, Id. 7,005; The Witch Queen, Id. 17,916.]

4. The right of preference may be lost by unreasonable delay.

[Cited in Cole v. The Atlantic, Case No. 2,976; Knox v. Ninetta, Id. 7,912; Packard v. The Louisa, Id. 10,652.]

5. But his lien is not defeated by a bona fide sale, before he has had an opportunity for enforcing it, and still less when the purchaser has knowledge of the claim.

[Approved in Cole v. The Atlantic, Case No. 2,976; Edwards v. The Robert F. Stockton, Id. 4,297. Cited in Packard v. The Louisa, Id. 10,652; The Avon, Id. 680; The Old Concord, Id. 10,482.]

6. By the civil law, and by the common law, the owners are responsible for all the obligations of the master, to their full amount, whether arising ex contractu or ex delicto. But by the general maritime law of Europe, the owners are not responsible for his obligations ex delicto, beyond the value of the vessel and freight. and by abandoning them they are discharged.

[Cited in Joy v. Allen. Case No. 7,552; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 430. Approved in Smith v. The Creole, Case No. 13,033. Cited in Mendell v. The Martin White, Id. 9,419; The Larch, Id. 8,086; The H. B. Foster. Id. 6,291; Francis v. The Harrison, Id. 5,038; Thomassin v. Whitwell, Id. 13,929; Re Long Island, etc., Transp. Co., 5 Fed. 611; The Scotland, 105 U. S. 28; Sumner v. Caswell, 20 Fed. 252.]

[Cited in Walker v. Boston Ins. Co., 14 Gray, 295, 297.]

---

[1] [Reported by Hon. Ashur Ware, District Judge.]

7. This limitation of the owner's responsibility has its origin in the maritime usages of the Middle Ages.

8. The master is not authorized to stow goods on deck without the consent of the owner.

9. If goods are so stowed, they are at the risk of the master, and if they are unavoidably lost or damaged, he cannot protect himself from his liability within the exception of the dangers of the seas.

[Cited in Weston v. Minot, Case No. 17,453; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 434; The Delaware, 14 Wall. (81 U. S.) 606; The Watchful, Case No. 17,250.]

The libel in this case alleges that the libellant, on the 20th of March last, shipped at New York, on board the schooner Rebecca, of which T. R. Cobb was master, ten hogsheads of liquor, consigned to E. Greely & Son, of Portland, to be there safely delivered, the dangers of the seas only excepted, at the stipulated freight of seventy-five cents the hogshead; that the vessel arrived at Portland, and the consignees offered to pay the freight, and demanded the delivery of the goods; and that the captain refused to deliver them, they having been lost in consequence of having been carelessly and improperly stowed by the captain; and prays for process against the vessel, her tackle, apparel, and furniture, that they may be condemned and sold to pay the libellant his damages. Scott, the claimant, in his plea and answer, states that he purchased the Rebecca on the 20th of December last, of David Jones, who purchased her on the 5th of the preceding April of Francis Chase, (the owner at the time when the liquor in question was shipped); that the vessel, in the intermediate time, has been repeatedly at New York, where the libellant resides, and might there have been attached if she were liable to the process, and denies that she is by law liable, under any circumstances, for the damages which the libellant has sustained.

The case was argued, on the question raised by the answer, as to the liability of the vessel, in specie, to answer for the damage sustained in consequence of the fault of the master, by

Longfellow, for libellant.

C. S. Daveis, for respondent.

WARE, District Judge. The libel and answer present a question of law, which, if decided in favor of the respondent, disposes of the case without the necessity of going into an examination of witnesses. This question is, whether the vessel is liable, in specie, to answer for the loss or damage, by the fault of the captain, of goods which are taken to be transported on freight. Another question, it is true, arises on the allegations of the pleadings; that is, admitting the general liability to be established, while the vessel remains in the hands of the owner at the time when the damage is sustained, whether this liability continues, under any circumstances, after a sale. This point, however, has not, in this

stage of the proceedings, been argued, for if the first question is decided in the negative, this becomes unimportant, and if decided in the affirmative, it may depend on the facts and circumstances under which the sale was made.

A doubt is suggested in the answer, but it was not insisted upon at the argument, whether the court has jurisdiction of the subject-matter of the libel. In a case very similar to the present, as affecting the jurisdiction of the court, I have had occasion heretofore to consider this question, and have seen no reason since for changing the opinion then formed after a very able argument and on mature reflection, that this court has, in a case civil and maritime, the authority to enforce a maritime lien by process in rem. Drinkwater v. The Spartan [Case No. 4,085]. The only point, therefore, to be considered in this stage of the case, is, whether, by the maritime law, a lien or privilege exists against the ship for the non-performance of the contract entered into by the captain in a bill of lading. On the one side it is contended that this is a general principle of maritime law, incorporated, from time immemorial, into the customary law of the sea, and resting for its authority on those usages and customs which form the basis of that universal marine law which is common to all commercial and maritime nations; on the other side, the universality of this principle is denied, and it is argued that if any such rule exists, it exists only as the particular law of particular countries, deriving its authority, not from the general customs of the sea, but from local usages, or special acts of legislation.

The authority principally relied on at the argument in support of the lien, is Abb. Shipp. He says, "The ship and freight, and therefore indirectly the owners, to the amount of the value of the ship and freight, are, by the marine law, bound to the performance of the charter-party," p. 93. He quotes, in support of the principle, the words of Cleirac in his Commentary on the Laws of Oleron, commonly referred to in support of this rule of the marine law. By custom, the ship is bound to the merchandise, and the merchandise to the ship. Ut et Coutumes, de la Mer, p. 72; Id. Navigation des Rivieres, §§ 18, 19, p. 503. Abbott afterwards adds, "It is true, indeed, that this principle of the maritime law, by which the ship itself, in specie, is considered as a security to the merchant who lades goods on board of it, cannot be carried into effect in this country, because the court of admiralty, in which alone proceedings can be carried on against the ship, has no jurisdiction in such a case." In a subsequent part of his work, he recurs again to this principle. "But," says he, "although the ship and freight are, by the terms of the charter-party, expressed to be bound to the performance of the covenants on the part of the owners or master, and this is con-

formable to the maritime law, yet, as before observed, there does not appear to be at present any mode of obtaining, in this country, the benefit of the security of the ship itself in specie for the performance of such a contract made here." Page 170.

It is difficult to find language more clear and explicit than that employed by the learned author on this subject, or to express a rule of law in terms less doubtful or equivocal. He states it as a rule, not only of the general maritime law, but also of the maritime law of England, and to which the common form of the charter-party, used in that country is conformable. Can any one doubt that if the court of admiralty was permitted to take jurisdiction of the subject-matter, it would give the proper remedy? It appears, if we are to take the law on Abbott's authority, that he leaves no room for doubt on the subject. It is true that the only authority he cites for the rule is Cleirac. On the question of the ancient customary law of the sea, a name of greater weight will not be readily found, even if it should stand alone. But this principle does not rest solely on his authority. One branch of the rule which he lays down, that is, that the master has a lien on the merchandise for his freight, expressed in the epigrammatic terms, that the merchandise is bound to the ship, is familiarly known and practised upon by every ship-master. That the other is not of such constant and familiar practice, is admitted. In the first place, the occasions for its application are comparatively rare; and in the second, in England, to whose authors and courts we have heretofore been in the habit of looking with too exclusive an eye for our maritime as well as our common law, admitting the lien to exist as a rule of law, it lies dormant and barren for the want of a court to enforce it. The courts of common law prohibit the admiralty, the only court which can give a remedy, from taking cognizance of the case. Yet so deeply rooted is this principle in the living spirit of the marine law, that even in England, long after it has ceased to be of any practical use, for the want of an appropriate process to enforce the lien, we find the principle itself acknowledged by her most learned and popular authors on maritime law, and preserved by a silent but most expressive tradition, in one of the most common instruments in use in commercial transactions.

The rule by which the ship is bound to the merchandise, appears to be of equal antiquity with that by which the merchandise is bound to the ship. Cleirac puts them both into the same sentence, and speaks of them as an ancient custom. By custom, says he, the ship is bound to the merchandise. He might well speak of the custom as ancient, even at that period, for we find the same principle in that venerable compilation of maritime law, the Consulate of the Sea, which existed several centuries before his time. In the chapters 58 and 63, it is said that if any part of the cargo is lost or damaged by bad stowage or the insufficiency of the vessel, the captain shall bear the loss; and if he is unable to pay, the ship shall; and if the ship is sold, the merchants shall be preferred to all other creditors, except the seamen, for their wages. The same principle in chapter 259 is applied to the case of damages to the cargo, arising from the personal fault of the master. And in chapter 72, it is laid down as a general rule that in all cases of damages mentioned in that code, the master shall bear his part, and each part owner his, for the ship pays all.

The principle of reciprocal liens, of the cargo on the vessel, and the vessel on the cargo, is established by the Ordonnance de la Marine, L. 1, tit. 14, art. 16; liv. 3, tit. 3, art. 24; and is preserved in the Code de Commerce, 191, note 11, 307. But this was not the introduction of any new and peculiar principle into the maritime code of France. It was merely sanctioning, by a formal action of legislation, what had existed as customary law from time immemorial, and so it is considered and treated by the commentators on the ordonnance and code. 1 Valin, 363, 629, 666. Emerigon, c. 12, § 3, in commenting on L. 1, tit. 14, art. 16, Saisie des Vaisseaux, which contains an enumeration of certain privileged credits, including the one now under consideration, says that the article neither creates any new privilege, nor takes away any that existed before; "la disposition n'est ni taxative ni exclusive." But he criticizes and censures the order in which the privileged creditors are marshalled, contending that the merchant, for the loss or damage of his goods, ought to have the first, instead of the fourth rank, which is assigned to him by the ordonnance. "It seems," says he, "that the privilege of those whose merchandise have been lost or averaged by any other cause than the dangers of the seas, ought to be placed in the first rank, even before the seamen, since such losses and damages proceed often from the act of the crew; and it would be still more equitable to give to the merchant shippers preference over those who have loaned money on the ship before her departure, because the shippers are ignorant of the supplies and loans, which may have been made in the place of outfit." Contrats a la Grosse, c. 12, § 4. Whatever may be thought of Emerigon's criticism of the arrangements of privileges by the ordonnance. there can be no doubt that he considered the lien in question as existing, independently of it, by the general marine law. Boulay Paty, the most approved commentator on the maritime part of the Code de Commerce, in his remarks on this article, says, "This rule is very ancient in the usages and customs of the sea." 2 Cours de Droit Maritime, 297. See, also, v. 1, 149, &c. It appears to me that these authorities justify the opinion that this rule exists as a part of

the customary law of the sea, independently of all local or particular legislation, and that it rests for its authority on the same basis as the greater part of the maritime law of this country, the customs and usages of maritime commerce.

But if we look at this question as one depending on the principles of the general maritime law of Europe, and not of the particular law of this country, it may be presented in another light which will lead to the same conclusion. And as this is a lien or privilege which is established by the general law, its justice and equity, as well as the reasons upon which it is founded, will be best understood by considering it in connection with other principles of that law. The revival of commerce in the Middle Ages, when the first elements of the maritime law were in the process of formation, did not long precede the restoration of the study of the civil law, in the celebrated schools of Italy; and the equitable principles of that law could hardly fail of impressing themselves upon the maritime jurisprudence of the age.

By the civil law, the owner or exercitor was personally bound for all the acts of the master, falling within the range of his authority as master. Omnia enim facta magistri debet præstare, qui eum præposuit (Dig. 14, 1, 5); ejus rei nomine, cujus ibi præpositus fuerit (Dig. 14, 1, 1, 7). He was responsible for the acts of the master, while engaged in the discharge of his functions as master, as well ex delicto as ex contractu. Aliquatenus culpæ reus est, quod opera malorum hominum uteretur, ideo quasi ex maleficio teneri videtur. Inst. 4, 5, 3; Dig. 44, 7, 5, 6. If there were several exercitors, each was bound in solido for the full amount of the obligations of the master, arising ex contractu. Dig. 14, 1, 1, 25; Dig. 14, 1, 2. But for obligations ex delicto, each was bound only for his part, that is, in proportion to the interest he had in the ship. Si plures navem exerceant unus quisque pro parte qua navem exercent convenitur. Dig. 4, 9, 7, 5; Voet, ad Pand. L. 4, 9, 5. The master also was directly liable for his own acts, and the creditor had his election to proceed either against the master or exercitor. Dig. 14, 1, 1, 17. The common law of England and of this country, except so far as it has been altered by statute, follows the civil law, and holds the owners responsible for the acts of the master, without distinction or limitation. It allows also the creditor to maintain an action against the master, unless by the terms of the contract he takes care to exclude his own liability. Hussey v. Christie, 9 East. 432.

Perhaps it may be found, upon a critical examination of the origin and history of the maritime law, that too much has been ascribed to the influence of the Roman law. Still many of its principles have been supposed to be derived directly from that law; but in adopting this principle of the responsibility of the owners for the acts of the master, if it were in fact derived from that source, most of the nations of Europe, if not all, with the exception of England, adopted it with an important qualification. They held the owners severally bound in solido for the acts of the master, whether of tort or contract, but limited the extent of their liability to the value of the ship. The creditors had always their remedy against the vessel, and through that, each owner was liable, but not beyond his share in the vessel. That this was the settled law of the Mediterranean is abundantly proved by several chapters in the Consulate of the Sea, which governed the maritime commerce of all the ports of that sea. In chapter 239 it is said that if the master borrows money for the necessities of the ship, in a place where the owners do not reside, the whole ship shall pay the loan, and no part owner can object. But if the ship is lost before the loan is paid, no part owner is bound to pay any thing. Let the lender then take care how he lends, for the owners lose enough in losing their shares. Again in chapter 186, if goods are lost or injured by being laden on deck without the consent of the shipper, and the master has not the means of paying, the ship shall pay. But the owners shall not be liable except for the amount of their shares in the ship. The same principle is again stated in chapter 227, in case of injury to goods by the want of proper apparel or rigging for the vessel. In the ordonnance of Peter III. of Aragon, for the regulation of the consular jurisdiction of Valentia, making the forty-five first chapters of the common edition of the Consulate, it is said that when the master is unable to satisfy the obligations which he has contracted, the lender shall be paid by the shares of the part owners, but that the master has no authority to bind their other property without a special procuration in writing for that purpose. Consulat de la Mer, c. 34, Boucher's Translation. In the jurisprudence of the Consulate, in addition to the direct liability of the master himself, the vessel was tacitly hypothecated for the obligations contracted by him, both ex contractu and ex delicto, but there resulted from them no personal liability on the owners. "In all damages which are here and shall be mentioned in the chapters of the sea, the master supports his part of what the ship pays, and each part owner his part, for the ship pays the whole." Chapter 72. See, also, cc. 58, 63, 94, 138, 193, 254, 289. The law of Holland has always limited the responsibility of owners in the same manner, and discharges them from all personal liability, upon their abandoning their interest in the ship to the creditors. Grotius says that the principle of the Roman law was never in force there, and he condemns it as both inequitable and injurious to the interest of trade. De Jure Belli et Pacis, liv. 2, cap. 11, § 13; Voet, ad Pand.

liv. 14, 1, 15; Huber Prael. Jur. Civ. L. 14, 1, 19; Vinnius in Peckium, note p. 155. The law of Sweden is explicit, that if the owners choose to abandon the ship, the creditor can demand nothing more, nor touch their other property unless they have specially bound themselves, (Maritime Code of Charles II. 1667, pt. 1, c. 16,) and the same limitation appears to be established by a statute of Hamburgh (Statute of 1603, tit. 18, art. 3; Kurike in Jus Marit. Hans, tit. 6, art. 2, p. 766). According to Emerigon, such is the established jurisprudence of the north of Europe. Contrats a la Grosse, c. 4, § 11.

The Ordonnance de la Marine provides that "the proprietors of vessels shall be responsible for the acts of the master, but they shall be discharged by abandoning the ship and freight." Liv. 2. tit. 8, art. 3. And this article was merely an affirmance of the pre-existing law. Cleirac, Navigation des Rivieres art. 15, p. 502. This celebrated ordonnance was formed upon all the previous maritime codes, ancient and modern, corrected, as is said, by particular information obtained at the time, of the actual maritime jurisprudence of all Europe, and in all questions in this branch of the law, has always been considered as of the highest authority. In such respect was it held on its first appearance, that Valin, in the preface to his Commentary, says that it became at once the universal law of maritime nations. The commentators on the ordonnance were divided in their opinions upon the extent to be given to this article. Valin held that it did not apply to obligations arising on the contracts of the master, but that for these the owners were liable personally for the full amount of the debt, and that the limitation of responsibility was confined to obligations resulting from his fault or negligence. Emerigon and Pothier, on the contrary, held that it applied both to obligations arising ex contractu and ex delicto. Contrats a la Grosse, ubi supra; Des Obligations, No. 452; Contrats Maritimes, No. 51. The Code de Commerce, by adopting substantially the language of the ordonnance, left the question undecided, and the controversy has been continued under the new law. Pardessus, Cours de Droit Commercial, part 3. tit. 2, c. 3. note 663, and the court of cassation adopt the opinion of Valin. 2 Emerigon, 650; Edit. of Boulay Paty, Addition.[2] Boulay Paty, in his Course of Maritime Law, as well as in his edition of Emerigon, adheres to the doctrine of Emerigon and Pothier. He has examined the question with his usual learning and ability, and concludes the discussion by asking, "Can a doctrine established for so long a time, attested by so great a number of jurisconsults, and fol-

lowed by all maritime Europe, be at this time seriously brought into controversy?" 1 Cours de Droit Maritime, tit. 3, § 1, p. 269. But this controversy. so far as it turns on the general law, is unimportant in the present case, as this suit is founded on the wrongful acts of the master, and I think it may safely be affirmed that, by the general maritime law of Europe, the liability of owners for the wrongful acts of the master is limited to the interest they have in the ship, and that by abandoning the ship and freight to the creditor they discharge themselves from all personal responsibility. It may be added that the statute law of this state has affixed the same limitations to the owner's liability. 1 Laws Me. c. 14, § 8.

If it be assumed as an established principle that, by the general maritime law, the responsibility of the owners for the acts of the master, is limited to the value of the vessel and freight, so far as his obligations arise ex delicto, for it is only so far that the doctrine is applicable to this case, and that by abandoning them to the creditor, they may withdraw themselves from their obligation, what is the natural consequence of the principle? Is it not to render the ship herself liable to the creditor in specie? So I understand the law, and such, as I understand it, is the doctrine of the books. Emerigon, in the chapter already quoted, says that the obligation of the owners is rather real than personal, and the language of the Consulate of the Sea is express, that, if the master does not pay the creditor, he may cause the ship to be sold and pay himself, restoring the surplus to the owner, after his own debt is paid. Chapter 239. Indeed, when the law confines a creditor to a particular fund for his remuneration, it cannot be so absurd as to prohibit him from making that fund available, by laying his hand on and securing it. The maritime law is not chargeable with any such absurdity; after it has, on principles of general policy, restricted him to a particular fund, it not only permits him to proceed directly against it in specie, but gives him a privilege against it over the general creditors of his debtor. This privilege, so far from being dangerous and embarrassing to commerce, as it was represented at the argument, appears to me to be perfectly natural and just, and entirely in harmony with the general spirit of maritime law. It stands on the principle of exact reciprocity. What can be more reasonable and equitable, when a privilege is given to the ship against the merchandise for whatever may be due from it as the price of marine transportation, than to allow a corresponding privilege to the cargo against the ship for whatever losses or average the cargo may sustain in consequence of the insufficiency of the ship, or the fault of the master? What more natural and just, when the ship has been the cause or occasion of the loss or damage,

---

[2] The American Jurist. vol. 19. p. 233, cites another case decided by the court of cassation, in which the limitation of responsibility is confined to obligations arising ex delicto, and quasi ex delicto.

than to look to the ship for reparation? For the fault of the master, the owners are responsible, as for their agent. The condition of the owner is not made worse by rendering the ship liable. It is indifferent to him whether the merchant obtains a satisfaction from the ship or from his other property; but it is not equally indifferent to the merchant whether he is allowed or not to look to the ship for security, as this is not only his best, but sometimes will be found his only security.

It is objected that this is a case of the first impression, and that the reports furnish us with no decision in point. The reason has already been given, why the English reports furnish no case. The common law courts cannot give the remedy, and they will not allow the court of admiralty to take cognizance of the case. Whether it be, or be not, of the first impression in this country, I am unable to say. A very small portion only of the decisions of our courts of admiralty is in print, and we cannot, therefore, infer with certainty that the principle has never been here decided, because no case is reported. But the true answer to the objection is, that the law does not consist of cases, but of principles, and when a party claims the benefit of a principle, the true question presented for the consideration of the court, is, whether the law is so; if it is, he is entitled to the benefit of the rule, though he may be the first man who has invoked its aid. In this case, my opinion is that the lien is sustained by the general principles of the marine law, as well as by the imposing authority of the most respectable writers who have illustrated, by their labors, this branch of jurisprudence. I feel the more confidence in the opinion which I have adopted on an examination of the authorities, from being informed that it corresponds with that of merchants in this place most conversant in maritime commerce.

The principle of the limitation of the responsibility of the owners for the acts of the master, together with the cognate rule, by which the ship is tacitly hypothecated for the obligations contracted by him, when acting in the quality of master, and within the scope of his authority as such, is entirely due to modern invention. No trace of it is to be found in the Digest of the Roman Law, nor in the maritime legislation of the Eastern Empire, nor in the compilation which goes under the name of the "Rhodian Law," a work which, though not entitled to the name which it has received, is undoubtedly a work of high antiquity, and of an earlier date than any of the maritime codes of western Europe. It originated in the maritime usages of the Middle Ages, and more particularly in the Mediterranean, where commerce first acquired activity and extension after the fall of the Western Empire. In Italy and the southern ports of France and Spain the custom seems to have been nearly coeval with the revival of maritime commerce. That it had its origin in the Mediterranean, and probably in Italy, the cradle of the modern law merchant, appears from the fact that no traces of it are to be found in the Laws of Oleron, a code earlier than the Consulate, at least in the form in which we now have it, and which constitutes the basis of the maritime law of the western parts of Europe; nor is there any indication of it in any of the earlier codes which were derived from this primitive compilation. It was at a later period that it extended to the western and northern ports of the Continent.

Fremery, a French advocate, in a recent ingenious and learned work on commercial law, traces the origin of the custom to the contract of commaude, commenda, or commendum, as it is variously written. Etudes de Droit Commercial, c. 27. By this contract, which constituted a sort of qualified partnership, or something between partnership and agency, a person having a capital which he wished to invest in commerce, might intrust it to a merchant or mariner for him to employ in trade, and to receive his compensation in a stipulated share of the profits, and account to the lender for the principal and such portion of the profits as was agreed upon in the contract. It was a cardinal principle in the law of the contract, that the person who advanced the capital, although the commendatary stood to him in the relation partly of a partner and partly of an agent, and although he had a direct interest in his contracts, should not be personally liable for them. The contracts of the agent bound himself and the capital which the lender advanced, with all its increase from the profits of the trade, but nothing further. This form of contract was probably suggested by the extreme perils attending on all commercial operations, in those ages of barbarism and disorder, and more particularly on those of maritime commerce. The profits of trade in those times were great and tempting, in proportion to the greatness of the risk, and by this contract men of capital were enabled to participate in these profits, without putting at hazard their whole property. It therefore had a direct and powerful influence in drawing out dormant capital, and putting it into a state of activity, and by thus giving a new impulse and greater extension to commerce, to render capital at once more productive to the owner and more beneficial to the community. This contract was the more important in maritime commerce, as the contract of insurance, which has so great an influence in giving extension to commerce in our time, was then unknown, that being an invention of later times. It was, in fact, in the primitive ages of trade, one of the most powerful springs by which maritime commerce was carried

on. It was highly favored, and all the commercial codes of the time go more or less into detail in prescribing the rules and principles by which it was regulated and governed. We find them in the Assise of Jerusalem, cc. 41, 46; 1 Pardessus, Collection des Lois Maritimes, pp. 272, 276, 280, established in the first years of the twelfth century. The Consulate of the Sea, besides other places in which the contract is incidentally mentioned, devotes eleven chapters (chapters 210–221) exclusively to the development of the principles by which it is regulated. See also the Statute of Marseilles of 1253, cc. 19–25; 4 Pardessus, 266; Establissemens de Montpellier, 4 Pardessus, 255; Statute of Genoa, 1588, lib. 4, cap. 13; 4 Pardessus, 527.

This contract being found to be so well adapted to the wants of society and to the hazards of commerce at the time, was not long in extending itself over the continent of Europe. It seems, however, never to have reached England, or at least never was adopted there as a general commercial custom. The British Islands have always been, to a considerable extent, insulated from the rest of Europe, in their customs and modes of thinking, as well as in their geographical position. Penitus toto divisos orbe Brittannos. It gradually fell into desuetude when, from the augmentation of commercial capital and the diminished dangers of commerce, it became less necessary in commercial operations; or rather it was superseded by another contract which was derived from it, that is, limited partnership, or societé en commandité. But it is a contract which, in all countries and all ages, must have been more or less used, though it may not in all have been sufficiently common to have acquired an appropriate name, or become an object of distinct consideration by legislators or jurists. In the law of France it is known under the name of "contrat de pacotille," and the principles by which it is governed appear to be well settled by the jurisprudence of the country. 1 Valin, sur Ord. de la Marine, 682–686, liv. 3, tit. 4, art. 2; Emerigon, Contrats a la Grosse, c. 1, § 5; Pardessus, Droit Commercial, part 3, tit. 3, c. 3. The principles of this contract were applied by the legislation and jurisprudence of the Middle Ages to the master of a vessel. He was considered not precisely as the agent, or in the language of the civil law, the præpositus of the owners, but as standing with regard to them in a peculiar relation, which was expressed by the term commendatory. He had the control and management of the vessel, and, in the absence of the owners, was authorized to enter into all contracts which were necessary to its employment. His contracts bound himself, and operated a tacit hypothecation of the vessel. The creditor might pursue the master personally, or might proceed by the arrest of the vessel.

But the owners were under no personal liability for the obligations of the master, arising either ex contractu or ex delicto. His contracts and torts bound their shares of the vessel, but bound them no further. The master had no authority to compromit their fortunes beyond the capital which they had intrusted to his administration. The Consulate of the Sea is perfectly explicit on this point. "If the master has not property nor means to pay the damage of the merchants, and he can be arrested, he ought to be put into the hands of justice, as if he had taken the ship in commande; for every master is and ought to be held and considered as a commendatary in all engagements he shall enter into with merchants on account of the ship; and this for many reasons which it is unnecessary to explain in this place." Edit. Pardessus, c. 295–250. This is the view which seems to be taken of the subject by Emerigon, whose mind was profoundly imbued with the maritime usages and jurisprudence of the Middle Ages. "The obligations of the proprietors," he says, "are rather real than personal. The captain, in the course of the voyage has the authority to borrow money for the necessities of the vessel, upon her hull; he may pledge her apparel; he may sell part of the merchandise and cargo. And this is all he can do. His legal power does not extend beyond the ship of which he is the master, that is to say, the administrator. He cannot bind the other property of the owners unless they have given him a special authority for that purpose." Contrats a la Grosse, c. 4, § 11.

The custom which exempted the owners from personal responsibility for the acts of the master, extended, as has been observed, as well to obligations arising ex contractu as ex delicto. No distinction was made between them, and on the principles upon which the custom stood in its origin and in the time of the Consulate of the Sea, there does not appear to be any just ground for a distinction. The master, who was, in point of fact, ordinarily, if not always, a part owner, was considered as the head and acting partner in a commercial enterprise, and not as the agent of the owners of the vessel, and merchants dealt with him and trusted him in that character. And this was the character which the maritime legislation and jurisprudence of the times attributed to him. But since the age of the Consulate, a great revolution has taken place in the state of civil society, and the reasons of public policy, in which the custom originated, have, in a great measure, ceased to exist. In consequence of the increased facilities of communication between nations, the greater security of maritime commerce, the vast augmentation of commercial capital, and the elasticity and vigor communicated to maritime adventures by the invention of the contract of insurance, extensive commercial enterprises are brought

within the means of individual capitalists, and the union of a number of fortunes has become unnecessary for the carrying on of commercial operations with safety and success, even upon a large scale. During the same period, a gradual and silent change has been operated in the relations of maritime commerce. The character and authority of the master of a vessel has fallen from that of the chief and the acting and responsible head of a maritime adventure, to that of the stipendiary agent or præpositus of the owners of the vessel. This change in the character of the master, should naturally be followed by a corresponding change in his authority and liabilities.

It is a rule of natural law, incorporated into every system of jurisprudence, that the contract of an agent, acting in the name of his principal, and within the limits of his authority, binds the principal, but does not, unless he exceeds his authority, bind himself. The contract of the agent is the contract of the principal, entered into through the medium and instrumentality of the agent. It is, therefore, directly binding upon him, as his own contract. It is also obligatory upon him on the principles of natural equity. He has the benefit of the contract, and in justice ought to bear its burden. But as the agent contracts in the name of another, and derives no personal advantage from the contract, there is no reason for holding him personally bound to fulfil its obligations. Looking upon the master of a vessel, therefore, as the simple agent of the owners, acting in their name and for their benefit, upon the plainest deductions of reason, as well as upon the principles of natural equity, his contracts, within the legitimate scope of his authority, ought to be personally binding on the owners, and, for the same reasons, they ought not to be personally obligatory upon himself. A just application of principles to the altered relations of the master to the owners, will reverse the ancient custom as to their liabilities.

It is, however, by no means so clear that, upon the principles of natural law, the owners are responsible for the tortious acts of the master. Their responsibility for his contracts is founded, as we have seen, on two considerations; first, that the contract is their own, and secondly, that the benefits of it exclusively belong to them. But the tortious acts of the agent do not fall within the limits of his authority. Such acts not being authorized by the principal, the agent, with respect to them, is not their agent, and they are not naturally responsible for them. If the principal has derived any benefit from such acts of an agent, to the extent of that benefit he is responsible, upon the principles of natural justice, for no man ought to be enriched by the loss and injury of another. Every one is bound to repair the injury resulting from his own unlawful and wrongful act. This is a principle of universal law and natu-

ral justice. Another principle, equally universal, is, that no one is responsible for the wrong done by another, unless he is particeps delicti. A person participates in the act when he authorizes or commands it to be done. He may also be said to participate in the act when it is done by one who is subject to his authority, and whose actions it is his right and duty to control; as a parent or master is responsible for the wrongful acts of his children or servants, when he has the power of preventing them, and does not. He having the right and the power, and the law imposing it upon him as duty, he is justly considered as authorizing the wrong which he does not prevent. Faults, like crimes, are in their own nature personal, and are not imputable except to the person who commits them, and upon the principles of natural law the fault of one person can never be imputed to another unless he was under an obligation to prevent it. But the positive jurisprudence of all countries extends this vicarious responsibility, upon principles of public policy, further than is strictly warranted by the precepts of natural law. And the doctrine is stated by elementary writers, that the principal is responsible generally for the wrongful acts of his agent, done in the execution of the proper business of his agency. Paley, Ag. pt. 3, § 1, p. 224; 2 Liverm. Prin. & Ag. c. 10, § 2, p. 207; Pothier, Des Obligations, Nos. 453–456; Domat, liv. 1, tit. 16, § 3, No. 1. Though a distinction is sometimes made between the negligence and unskilfulness of an agent or servant, and acts of wilful and intentional wrong; holding the principal responsible for the former, and not for the latter. McManus v. Crickett, 1 East, 106.

The rule which holds the principal responsible for the tortious acts of his agent, will in its terms include the master of a vessel. But as it is a rule founded merely in expediency, and not in natural justice, except so far as the principal has derived a benefit from such acts, public policy must also determine to what cases the rule shall extend. The general sense of the commercial world seems to be satisfied with holding the owners of vessels responsible to the extent of their interest in the ship, and by abandoning the ship and freight to the creditors, they are discharged. This has for a long period, if I am not mistaken, been the law of all the maritime nations of the continent of Europe, with respect to damages arising from the wrongful and illegal acts of the master. It, however, has never been acknowledged in England or this country, as customary law, though it seems that the sense of the commercial community is in favor of this limitation of the owner's responsibility for the tortious acts of the master. And accordingly on the petition of merchants and ship-owners, it has, in a number of particulars, been established in England by acts of parliament. Abb. Shipp. pt. 3, c. 5. We have in this

·country no act of the general government on the subject, but a similar limitation of the ·responsibility of the owners has been established by legislative authority in the states ·of Massachusetts and Maine.

But there is certainly great difficulty, consistently with the present usages of maritime commerce, in extending·this rule to the contracts of the master. By the general principles of law, if he contracts in the name of the owners, and the contract is within the scope of his authority, it will not be binding on himself. If it is not obligatory on the owner, then no one is personally bound, and ·every debt created by the master, in the prosecution of a voyage, would be resolved into a bottomry loan. The creditor would have nothing but the vessel for his security. The law of England, and of this country (Abb. Shipp. pt. 2, c. 2, § 2; 3 Kent, Comm. 161), does, in favor of commerce, hold the master personally responsible for his contracts, unless, by the terms of the contract, the credit is confined to the owners. But in France the law is reversed, and he is not personally bound, when he contracts in his character as master, unless he exceeds his authority, or is bound by the express terms of the contract. Emerigon, Contrats a la Grosse, § 12; Fremery, Etudes de Droit Commercial, c. 27, p. 188. The personal responsibility of the master, in the majority of cases, would not probably give much additional security. But the change which time has operated in the relations and character of the master of a vessel, from that of a party largely interested and the sole director of a maritime expedition, to that of a stipendiary agent of the owners, has superseded all the reasons upon which the custom, of which we have been speaking, was originally founded, so far as relates to his contracts. But the limitation of the responsibility of the owners, for the tortious acts of the master, that is,·acts of wilful and intentional wrong, and not of mere unskilfulness and incapacity. appears to be founded in justice, and is recommended by strong and obvious motives of public policy.

February 19.—After the decision was pronounced on the question of law raised by the libel and answer, the case was heard on the evidence. The sale of the vessel was proved, as alleged in the answer; it was further proved that the rum was stowed on the deck of the vessel, and as well secured there as a deck-load is ordinarily in a West India voyage; but after the Rebecca left New York, she encountered a gale of such unusual violence, that it was argued that the loss of the deck-load might be inferred as a necessary consequence of the violence of the seas, and the deposition of the wife of the master was offered to prove the fact, but it was rejected as inadmissible on account of the interest of her husband. The freight agreed for was seventy-five cents per hogshead, and the freight of the corn under deck was two cents per bushel; that

the ordinary freight in vessels regularly trading between New York and Portland was one dollar per hogshead, and five cents per bushel for corn; but in transient vessels, as this was, the price varied from seventy-five cents to a dollar. As soon as the libellant heard of the loss of his goods, he ordered process to be instituted against the vessel, but before it could be served she had left the port, and did not return until a day or two before she was arrested. During the summer she had been employed in carrying rocks from the North river to the breakwater in the Delaware, and had twice stopped at the port of New York for a few days; but there was no proof that the libellant knew of her being there.

WARE, District Judge. The general question of the liability of the vessel to answer in specie for the loss or damage of goods taken on freight, in those cases in which the master and owners are personally liable, having been decided, the case now stands for decision on the facts, and principles of law which they involve. The libel is founded on the bill of lading, by which the master contracted for the safe carriage of the goods, and for their delivery to the consignee, the dangers of the seas only excepted. It is contended, on the part of the respondent, that the loss was occasioned by the dangers of the seas, and is therefore within the exception. The evidence on this point, the deposition of Mrs. Cobb.being excluded, is not direct and conclusive, though such as to render it in some degree probable, and if it were material to be proved, the respondent might be entitled to time to procure and introduce the evidence. But in the view which I have taken of the other facts, I do not think it material. All the merchandise stowed in the hold came safe, and there is every reason to believe if this had been thus stowed, that this also would have been brought safe. The inference is, therefore, irresistible that the goods were·lost in consequence of their exposure on the deck. Even if it were admitted that the written contract might be ex plained by parol evidence, the respondent has failed in an attempt to prove that they were thus stowed by the consent or with the knowledge of the owner; he has equally failed to prove that they were taken at a reduced freight. from which such a consent might be inferred from the usage of trade. On the contrary, the freight paid in this case by the shipper, was at a higher rate than that paid for goods that went in the hold. The freight of the corn and coffee below was at two fifths of the ordinary rate paid in the regular packets, and that agreed upon for the rum was three fourths. The argument, therefore, if any could be derived from the rate of the freight, would be rather against than in favor of the respondent.

The case, then, is brought to this point; is the master, on a common contract of affreightment, authorized to stow the goods on

deck, without the consent of the owner? I think it quite clear that he is not, and that if he does so, it is done at his own risk; if any loss or injury happen to them. he must answer for it. When he signs a bill of lading, in common form, he contracts to carry the merchandise safely in the usual mode of conveyance, which is to have it safely stowed under deck. Such is the universal custom. If there may, by the usage of trade, be an exception in particular places in favor of small craft, plying between port and port, such as that mentioned by 1 Valin, 397, 2 Valin, 203, or should it be admitted that the usage of carrying a deck-load in vessels of greater burden, such as was testified to as existing between this port and Boston. may, in the particular cases, protect the captain from his liability, the usage, being in dero· gation of the general rule, in order to avail the captain in his defence. must be strictly proved, and no such usage is proved as existing between this port and New York. On the contrary, we learn from the testimony that goods are sometimes taken on deck by agreement, in which case the usual terms are half freight, but that if they are stowed on the deck without the consent of the owner, they are understood to be at the risk of the master. This case, then, falls under the general rule, and the master, when he signed this bill of lading, bound himself to all the obligations, as to the safe and careful stowing of the merchandise, that he would have been bound to had it been for a foreign voyage. He cannot exempt either himself or the vessel from liability under the contract, within the exception of dangers of the seas, unless the dangers were such as would have occasioned the loss had the goods been safely stowed under deck. See the case of Dodge v. Bartol, 5 Greenl. 286. But this, it appears in the present instance, would not have been the case, as the goods under deck came safe. It follows that though in point of fact the goods were washed over by the violence of the seas, the master is responsible, and therefore the vessel, which stands as surety for his default in this particular, unless she is exempted by other facts in the case.

It is contended that she is exempted on two grounds. First, it is said that the shipper has lost his lien by neglecting to enforce it within a reasonable time. It is admitted that the general interests of commerce require that liens of this description should be enforced without undue delay, and the evidence in the present case. shows due diligence on the part of the merchant. As soon as he heard of the loss, he ordered process to be commenced against the vessel, but, before it could be served, she had left this, her home port, and did not return until about nine months after, when she was immediately arrested. It is true that in the intervening period she was engaged in transporting rocks between the Hudson river and the Delaware,

passing the city of New York at every trip, and that twice she stopped at that port for a few days. But it is not proved that these facts were known to the libellant. The master at the time was changed, so that if she had been reported in the shipping lists, it would not be obvious that it was the same vessel, and the nature of her employment was not such as would be likely to bring her to the notice of a merchant. These circumstances are certainly not strong enough to justify a presumption of knowledge on the part of the libellant, without proof, and the simple delay of nine months, under the existing state of facts, will not create a bar to this suit, in the nature of a prescription.

If the lien is not extinguished by prescription, it is contended that it is defeated by the transfer; that though the vessel might be still liable in the hands of the original owner, it ceases to be, in the hands of a bonâ fide purchaser. Every maritime privilege, says Emerigon, carries with it a tacit hypothecation. Tout privilege emporte avec soi hypotheque tacite. Contrats a la Grosse, c. 12, § 2. It is created by the operation of law, without any concurring act on the part of the creditor, and attaches itself to the thing bound, from the moment that the debt exists. The lien or right of the libellant was anterior in date to the title acquired by the purchaser. Will the law permit this right to be defeated by a sale, without any fault or negligence on his part? The policy of the law, in allowing to the shipper a privilege against the vessel, is to give him additional security. He may wish to ship goods in a vessel with whose owner he is unacquainted; or the vessel may be chartered by the master on such terms that the owner would not be responsible for his acts, and the merchant may be entirely ignorant of the terms of the charter. In favor of commerce, the law allows him to look to the vessel herself for his security. If it did not allow him a reasonable time to make this security available, if it could be defeated by an immediate sale of the vessel, it would be usually found to fail precisely on those occasions, and under those circumstances, which are the principal reasons for giving the privilege; that is, when the owner, or the exercitor under the charter-party, is not, in point of property, responsible.

I do not mean to deny, if a privileged creditor remains silent after having had a proper opportunity to enforce his lien, and suffers the vessel to be sold to a purchaser without notice of the claim, that he may forfeit his rights, or may be considered as waiving them, and as relying on the personal responsibility of the master and owner. On the contrary, it appears to me that any considerable delay must endanger his lien. But in the present case. nothing of this kind has occurred. The shipper has used all the diligence practicable, and has proceeded to enforce his right at the earliest opportunity.

Under these circumstances, my opinion is that the purchaser took the vessel cum onere. If this is a correct view of the case, it applies as well to the second purchaser as the first.

It was strongly urged at the argument that the sales were not -bonâ fide, but made with a view of withdrawing the property from the. reach of the libellant. I do not place my opinion on this ground; but the evidence is entitled to much consideration in another point of view. Admitting that the sale was bonâ fide, and not colorable merely, the case of the respondent will not· be strengthened if it appears that he purchased with notice of the claim, and of the vessel's liability. The first transfer. to Jones, was to the son-in-law of the owner. Before this sale, the consignee gave notice to the master that the vessel would be held to answer for the damages. The knowledge of this is not indeed, by the evidence, brought home with certainty to the purchaser, but the presumption is very strong that he knew of the misfortune that had occurred on the voyage. On the return of the vessel to this port, in December, Jones, who went in her as master, left her at Boston and returned by land, and, before her arrival, transferred the vessel, with evident marks of precipitation, to his brother-in-law, Scott, the present claimant. As both the owner and the master, at the time when the loss happened, were insolvent. these proceedings are naturally calculated to create a suspicion that the intention of the libellant, to look to the vessel for his damages, was understood by the parties, and that these transfers were made with a view of embarrassing him in his remedy; and these suspicions are raised into a presumption, when it is observed that the claimant, in his answer, has not ·denied his knowledge of the existence of this claim. It is true, that silence is not to be taken as a confession, but it is equally true that it is not a denial. Qui tacet non utique fatetur, verum est tamen cum non negare. Dig. 50, 18, 142. And in a case where a denial might be of some importance to a party, and when it might well be interposed, his silence, though not construed into proof against him, leaves all the facts which have a tendency to raise a presumption of his knowledge, pressing upon his case with their full weight.