## THE NEWPORT.

### PACIFIC MAIL. S. S. CO. et al. v. WILSON et al.

(Circuit Court of Appeals, Ninth Circuit. November 1, 1926.)

No. 4902.

1. **Collision ⬤⟞38—Vessel with right of way held guilty of contributory fault for collision with burdened vessel holding course (International Rules, arts. 19, 21, 27 [Comp. St. §§ 7858, 7860, 7866]).**

Vessel with right of way, under International Rules, arts. 19, 21 (Comp. St. §§ 7858, 7860), *held* guilty of contributory fault for collision in failing to change course when it became evident that burdened ship was going to hold her course, in view of article 27 (Comp. St. § 7866).

2. **Collision ⬤⟞115**

·Master of burdened vessel *held* personally liable for fault of inexperienced third officer, whom he had left in charge and who failed to see the other vessel.

Appeal from the District Court of the United States for the Southern Division of the Southern District of California.

Libel by Henry Wilson and others against the steamship Newport, her engines, boilers, tackle, etc., the Pacific Mail Steamship Company claimant, and others, in which claimant and others filed cross-libels. From an adverse decree, the claimant and another appeal. Reversed, with directions. ·

Farnham P. Griffiths, Russell A. Mackey, and McCutcheon, Olney, Mannon & Greene, all of San Francisco, Cal., for appellants.

Louis T. Hengstler and Frederick W. Dorr, both of San Francisco, Cal., for appellees.

Before HUNT and RUDKIN, Circuit Judges, and ST. SURE, District Judge.

HUNT, Circuit Judge. In a calm sea on a clear bright morning in November, 1922, about 12 miles off the coast of California, near Point Buchon, the steamship Newport, 337 feet long, south bound, collided with the steam schooner, Svea, 170 feet long, bound north. The Svea interests libeled and the Newport interests cross-libeled. The Newport admitted fault, but assumed that the Svea was also at fault. The Svea denied fault, and set up that the collision was due solely to the fault of the Newport.

The District Court held that the collision was due to the negligence and fault of the Newport, and that the plea of contributory negligence on the part of the Svea was not substantiated. Decree was entered against the Newport and her owners, Pacific Mail Steamship Company, and McKinnon, her master. The steamship company, claimant of the Newport, and McKinnon, her master, appeal, contending that the decree should be based upon mutual fault, and that the captain of the Newport should be exonerated. ·

The vessels approached from converging courses and were in sight of each other from the time they were about 8 miles apart. The crossing courses were such that the Newport held the Svea on her right side about three points off her starboard bow. The Svea had the Newport about three points off her port bow. There was no change of bearings from the time the vessels saw one another. The full speed of the Newport was 10 knots, and that of the Svea 7½ knots. The collision was at about right angles, the stern of the Newport striking the Svea amidships on the port side. Both ships were badly damaged.

It is admitted that there was plain fault on the part of the Newport, the burdened ship. Article 19, International Rules, 26 Stat. 327 (Comp. St. § 7858). Her master left the bridge and went to the lavatory before he saw the Svea. The third officer remained in charge. Just before the collision the master heard the whistle, and looking through a port hole, saw the Svea. He went at once to the bridge, found the engines full speed astern, but was too late to do anything to avert the collision.

When the ships were about 3 miles apart with unchanged bearings, the mate of the Svea remarked to the captain, "I wonder what she is going to do." The captain replied, "I think he knows the rules of the road," and kept his course and speed. After the Svea had gone another mile, and the ships were about two miles apart, with unchanged bearings, the master of the Svea blew one whistle, which called for passing port to port. Although the whistle could have been heard two or more miles away, the Newport made no response. The mate of the Svea, using his glasses, saw no one on the bridge of the Newport and so reported to the master. The ships proceeded on their courses with unaltered speed until they were a little over a mile apart. The captain of the Svea then gave a danger signal of four blasts and kept his course and speed. No response came from the Newport. The ships were approaching closer and closer, the bearings remaining unchanged. As the vessels proceeded to a point about three-eighths of a mile apart, the captain of the Svea, seeing no activity on the bridge of the Newport,

blew a second danger signal. Still no reply from the Newport, and still the ships proceeded without changing their courses and speeds.

Immediately before the collision the mate of the Svea sung out, "Hard aport!" The master testified that he did not countermand that order, because the ships were not far apart, and, believing that collision was then inevitable, by following the order the Svea would strike in a straight, instead of a slanting, way. When asked whether at the time of the giving of the order to hard aport, there was any chance to avoid the collision, he replied, "No, not on my side." His testimony was that, when he blew the second danger signal and the ships were coming close together, there was plenty of time for the Newport to clear the Svea; that when he realized that the Newport was not going to do anything, the ships were only about a length apart; that, if he had then reversed his engines, he would have rammed into the Newport amidships; that after he blew his last danger signal he considered whether or not he should stop the Svea or back, but that he decided to go ahead, believing the Newport would change, and knowing that the Svea had the right of way; that, if he had stopped or slackened speed or reversed in an effort to avoid collision and the Newport at the same time had ported her helm, there would have been a collision. On cross-examination he said that when the ships were over a quarter of a mile apart he concluded that if he acted there would be some mistake, and that it was best to keep his course and speed; that he did not know what the Newport was going to do; that he doubted what she was going to do; that he knew what the duty of the Newport was; and that there was a chance for her to go clear.

[1] While the argument that the Svea, as the holding-on vessel, was under a primary duty to keep her course and speed (article 21 [Comp. St. § 7860]), and that it was the duty of the Newport to keep out of her way, is sound as far as it is applicable, nevertheless, as we held in the West Hartland Case (C. C. A.) 2 F.(2d) 834, the duty imposed upon the Svea did not relieve her of the responsibility of deciding if and when it was necessary to depart from the rule in order to avoid immediate danger. Like many other rules, it is to be observed, having due regard to the dangers of the situation and "to any special circumstance which may exist in any particular case, rendering a departure from them necessary in order to avoid immediate danger." The Sunnyside,

91 U. S. 208, 23 L. Ed. 302; Art. 27, Gen. Prudential Rules (Comp. St. § 7866).

In The Delaware, 161 U. S. 459, 16 S. Ct. 516, 40 L. Ed. 771, the court held that the preferred steamer would not be held in fault for maintaining her course and speed so long as it is possible to avoid her by porting; at least, in the absence of some indication that she is about to fail in her duty. In The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126, where a like view was expressed, the case arose under the old rules, which required both vessels to slacken speed and reverse, if necessary, to avoid collision, but it is none less pertinent as to the general duty to adopt proper precaution to prevent collision. In The Devonian (D. C.) 110 F. 588, Judge Lowell said that the duty of the privileged vessel is to hold her course, and of the burdened vessel to keep off that course, but that the privileged ship should constantly observe the burdened one, in order to note whether the latter fails in her duty, and that, when the failure of the burdened vessel becomes apparent, the privileged vessel must change her course as prudence demands.

The principle upon which the cases cited rest must control. The mate of the Svea saw no one on the bridge of the Newport; the captain and the mate were concerned, for they knew that, if the courses were kept, collision was inevitable. When the ships were two miles apart, the situation "did not look very good" to the captain of the Svea; a signal of one blast at two miles was not answered. A danger signal at one mile, and a second danger signal at three-eighths of a mile, were unanswered, and never any change in the course of the Newport.

The fact that the Newport failed to maneuver immediately after the last signal from the Svea, when considered with the immediately antecedent facts and circumstances, as already outlined, made it distinctly apparent, we think, that she intended to persist in her course and thus made the danger of collision manifest. It therefore became the duty of the Svea to yield adherence to the primary right to hold her course and speed, and to do what she could to avoid disaster. Mariners of long experience testified that in their judgment the conduct of the Newport clearly indicated that she did not intend to change her course and that the Svea should have been stopped when the Newport was from three-eighths to a half a mile away.

[2] It is contended that the decree holding the master of the Newport personally liable

is erroneous. Accept it that the evidence excuses the master from personal negligence, and the question is: Should he be held responsible for the negligence of his subordinate officer, the mate, whom he left in charge when he went to the lavatory? The captain testified that, when he went to the bridge, the excuse given by the mate for not avoiding the Svea was that he did not see her. The captain was then asked whether or not he had given instructions to his officers about standing watch on the bridge, to which he replied that at the time of the collision the third officer was keeping his first watch on the ship; that he had shipped the day before and was making his first voyage.

In Wilson v. The Belvidere, 30 Fed. Cas. 106, No. 17,790, the court, in referring to the duties of a master, said: "Masters often attempt to fix the sole responsibility on mates, to screen themselves, who, of all others, should constantly exercise the most care and marked attention. If their engagements in other duties, or their avocations, throw on the mates the executive duties, they being (though approved by the owners) selected by the masters and their deputies, the masters must share responsibilities when casualties occur." Nicholson et al. v. Nouncey et al., 15 East. 384, decided in 1812, distinguished between the liability of a captain of a ship of war and the captain of a merchant ship. Lord Ellenborough pointed out that the captain of a ship of war had no power to appoint the officers and crew on board and that the captain himself was not a volunteer, but was obliged to serve and to take the persons whom he found on board and make the best of them, whereas the owner or master of a merchant ship is answerable for those whom he employs for injuries done by them to others within the scope of their employment.

Spencer on Collisions, § 182, writes that the party injured by collision may not only look to the vessel inflicting damages to the extent of its actual value, and to its owners to the extent of their interests, but to the master, and that the master is not only responsible for his own conduct, but also for the conduct of his crew. In Shearman & Redfield on Negligence (6th Ed.) 246, it is said that under the rules peculiar to mercantile law the master of a private ship is responsible to third persons for his own negligence to the fullest extent, and for the negligence of all employed on board to the same extent as if he were the ultimate principal. Marsden on Collisions at Sea cites Denison v. Seymour, 9 Wend. (N. Y.) 9, in support of the text that a master has been held liable for the negligent and wrongful acts of his crew, as well as for his own act. In the case referred to the court reasoned that a captain of a merchant ship is not bound to engage in the service, but, if he does he takes the position with the responsibility incident to his employment, and that, inasmuch as he appoints the mates, he is generally responsible for their negligence.

Kennedy v. Ryall, 67 N. Y. 379, directly presented the question how far a master of a ship is answerable for damages arising by reason of the negligence of those employed under him. The defendant was in command of a steamship at quarantine, which the deputy health officer ordered to be fumigated. By order of the health officer the steward cleared the passengers from the steerage and certain utensils containing poison were placed in the steerage for purposes of fumigation. Directions were given by the health officer as to the time the steerage should remain closed and as to the removal of the utensils. A drinking cup was not removed and the plaintiff's intestate, a child, who had been ordered by the steward to return to the steerage, drank some of the poison and died as a result. The court held that the steward, so far as he attended to the removal of the poison and the reinstatement of the steerage, was apparently acting within the general scope of his duty, and it was assumed that he did act with the approval of his superior officers. It was said that to all intents and purposes the steward became a servant of the master of the ship, acting for him and on his behalf. "That officer," said the court, "was in command of the vessel, and it was under his control and subject to his general management and direction—at least until the completion of the voyage and it was safely in port. By a rule peculiar to the mercantile law, the master is liable for the negligent acts of the employee, while engaged under his authority, to the same extent as if he were the ultimate principal, who is ordinarily bound to respond in damages for such negligence." The master was held liable for the act of the chief steward in not removing the cup and poison which were the cause of the death of the child.

Story on Agency, § 315, wrote that the policy of the maritime law has "indissolubly connected" the personal responsibility of the master with that of all the other persons on board who are under his command and are subjected to his authority. He put the foundation of that liability upon the rule established by early primary authorities that

in maritime law the master is treated, not merely as an agent in his own behalf, as well as in behalf of the owner, but as, in a way, a subrogated principal and qualified owner, having authority for the time being. Story gives, as an additional reason for putting responsibility upon the master for his officers and crew, that the master, by reason of the responsibility, is induced to exercise superior watchfulness over the acts and conduct of his subordinates. Judge Addison Brown in The City of New York (D. C.) 25 F. 149, held the same way, saying: "In modern maritime law, so far as I can discover, the liability for injuries through negligence is confined to the owners of the ship and to the master, who is responsible for all his subordinates that are appointed by him and are under his control, * * * and that is the general rule in English and American law." Kay on Shipmasters and Seamen, vol. 2, p. 1153.

Counsel for the master of the Newport cite The Rebecca, 20 Fed. Cas. 373, No. 11,619, decided in 1831. Judge Ware there referred to the fact that in early maritime jurisprudence the master was usually part owner of the ship, and was not dealt with as an agent of the owner; whereas, under modern conditions, the authority of the master is more that of a stipendiary agent or præpositus of the owner, and held that under the altered relationship there should be a reversal of ancient customs as to the master's liability. There is force in the reasoning, but it does not seem to have been sufficiently cogent to persuade textwriters and courts to break the more ancient and stricter doctrine of the maritime law.

Our conclusion is that upon the authority of the cases cited the master was properly held liable for the inexcusable negligence of the third officer. The decree must be reversed, with directions to enter a decree based upon mutual fault, with the usual apportionment of damages of cross liability in admiralty. Costs in this court and in the court below to be equally divided.

Reversed.